**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 19, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

SANTIAGO MARTINEZ,

    Defendant - Appellee.

No. 23-2193
No. 24-2002
No. 24-2004

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:21-CR-01934-MV-1)**

_____

C. Paige Messec, Assistant United States Attorney (Alexander M.M. Uballez, United States Attorney, with her on the brief), Office of the United States Attorney, Albuquerque, New Mexico, for Plaintiff-Appellant.

Violet N. D. Edelman, Assistant Federal Public Defender, Office of the Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellee.

_____

Before **PHILLIPS**, **CARSON**, and **FEDERICO**, Circuit Judges.

_____

**FEDERICO**, Circuit Judge.

_____

This Government appeal arises out of a pending murder prosecution in New Mexico currently in the pretrial phase. In the early hours of November 13, 2021, DeAnna Suazo suffered an untimely death outside her home on the Taos Pueblo, where she was discovered underneath her running vehicle with signs that she had been run over. A week later, following a "failed" polygraph test, her boyfriend, Santiago Martinez, made statements indicating that he pushed Suazo to the ground in front of her vehicle and then ran her over with it.

Martinez was indicted by a grand jury in the United States District of New Mexico on one count of second-degree murder in Indian Country in violation of 18 U.S.C. §§ 1111(a) and 1153. Several pretrial motions were adjudicated before the district court and are now before us in three separate appeals, which we consolidated into one.

First, Martinez filed a motion to suppress statements that he made to a Federal Bureau of Investigation (FBI) agent during a post-polygraph interview. The district court granted the motion and suppressed the statements. The Government now appeals this decision in case number 23-2193.

Second, the Government filed a motion in limine seeking a pretrial determination on the admissibility of certain text messages exchanged between Suazo and Martinez prior to Suazo's death. These messages, spanning

2

the six months before her death, are purported to be evidence that Suazo was unhappy with their relationship and wanted to end it. The Government argued that these messages were not hearsay per Federal Rule of Evidence (Rule) 801(c)(2), as they were not offered for the truth of the matter asserted but rather to show their effect on Martinez as the listener. The district court ruled these text messages inadmissible at trial. That decision is now on appeal in case number 24-2002.

Third, the Government sought an in-limine ruling that the witness testimony of a prior incident in which Martinez assaulted and acted violently toward Suazo would be admissible at trial as "other crimes, wrongs, or acts" under Rule 404(b). Again, the district court disagreed with the Government and issued an order excluding this evidence from trial, a decision now before us on appeal in case number 24-2004.

In this interlocutory appeal, we have jurisdiction under 18 U.S.C. § 3731. Considering the record and arguments in full, we reverse and remand for further proceedings consistent with this opinion.

# I

## A[1]

On November 12 and 13, 2021, Suazo and her boyfriend of 10 years, Martinez, both of whom were 29 years old, were at their residence in Taos Pueblo, New Mexico. After Suazo and Martinez went grocery shopping together the evening of the 12th, Suazo prepared dinner at their home, and they ate between approximately 5:00 and 6:00 p.m. After dinner, Martinez played video games while Suazo, a noted artist, worked on her artwork. That evening and into the morning of the next day, they consumed alcohol and smoked marijuana together.

According to Martinez's original account of the events, at some point they took a break from their respective activities to sit in Suazo's vehicle to listen to music, as there was no music system inside the house. Suazo sat in the driver's seat and Martinez sat in the passenger seat. They continued drinking alcohol inside the vehicle. Martinez stated that there was no one else at the residence or in the area.

---

[1] The facts in this section are allegations from the criminal complaint and are recited here for background purposes. We emphasize that Martinez is presumed innocent of the charge in the indictment unless or until a jury finds the Government has proved him guilty beyond a reasonable doubt. *Agnew v. United States*, 165 U.S. 36, 51 (1897).

Per Martinez, in the early hours of November 13, he exited the vehicle and went inside the house to add wood to a fire. He was uncertain how long he had been inside due to his level of intoxication. Upon returning outside at around 3:30 a.m., he found Suazo's vehicle running and Suazo unresponsive on the ground near the front driver's side tire of the vehicle. Because, as Martinez reported, the front tire was against Suazo's head and on her arm, he moved the vehicle to free her arm from under the tire.

Martinez did not call 911; instead, he called members of his and Suazo's families to tell them she was deceased. Family members arrived at the scene and performed CPR on Suazo, while another family member called emergency services. Local police from the Taos Pueblo Department of Public Safety and paramedics initially responded to the scene. After assessing the situation, local police contacted the FBI, who arrived to assist. Paramedics transported Suazo to the hospital, where she was pronounced dead upon arrival.

Law enforcement officers observed significant injuries to Suazo's body, including some injuries consistent with being run over by a vehicle. Law enforcement also observed (1) the driver's side door of the vehicle was open, (2) a dark, dried red substance near the inside driver's side door handle, and (3) wet spots on the dirt outside the driver's front and rear doors. Additionally, one witness interviewed by law enforcement at the scene described Suazo and Martinez's relationship as "toxic." Aplt. App. I at 35.

Martinez told investigators at the scene that he and Suazo had never been in a physical altercation and that he did not know how Suazo ended up under her vehicle. When speaking with Martinez, officers observed a fresh cut on the knuckle of his right index finger, abrasions on his arms, hands, and elbows, and blood on his sweatshirt.

**B**[2]

When speaking to FBI agents at the scene the morning of November 13, 2021, Martinez volunteered to take a "lie detector test." Aplt. App. II at 32. Over a week later, on the morning of November 22, 2021, two FBI agents, Mariana Manachi and Michelle Cobb, went to Suazo's great-aunt's house to follow up on Martinez's offer and speak with him. Suazo's family members, as well as Martinez and his parents, were there assisting with cleaning the house and managing affairs following Suazo's funeral. The two agents asked to speak with Martinez at the Taos Police Department, to which he agreed.

Martinez and his parents drove together to the Taos Police Department, arriving separately from the agents. Upon arriving, the three were escorted to a room specifically arranged to provide a private space for discussion. Inside

---

[2] The facts in this section are derived from testimony and exhibits presented at a suppression hearing before the district court.

the room were Martinez, his parents, and two FBI agents, including Agent Cobb.

A 10-to-15-minute discussion ensued, during which the two agents sought Martinez's cooperation in answering additional questions. In keeping with their practice of conducting one-on-one interviews, the agents requested to speak with Martinez individually. They also presented to Martinez the option of taking a polygraph test, clarifying that it was not mandatory. Martinez's parents encouraged him to cooperate, and he agreed, stating he would "do whatever." *Id.* at 26. His parents then left the room, returning to the lobby area to allow the agents to chat privately with Martinez. The agents did not explain to Martinez's parents how long the interview would take.

Once alone in the room with Martinez, the two agents began recording their conversation with him at approximately 10:26 a.m. After asking some questions about the events of November 12 and 13, Agent Cobb inquired into whether Martinez was still willing to take a polygraph test, suggesting that it could "clear [his] name quickly." Aplt. App. I at 191. Martinez consented, stating, "If that's what I need to do, then I'll do it." *Id.* During this conversation, neither agent mentioned the possibility of a post-polygraph interview. The recording was turned off at approximately 10:32 a.m.

7

**1**

Martinez was escorted to a different room for the administration of the polygraph test, where Special Agent Donna Coyle had set up the polygraph machine. This room was located down the hall from the original room within the police station and featured a one-way mirror. The room measured approximately 10-by-20 feet, containing one table and two chairs. Only Agent Coyle and Martinez were inside this secondary room, while Agent Cobb observed from the other side of the one-way mirror and was able to see and hear into the room without being perceived.

Agent Coyle then began recording her conversation with Martinez at approximately 10:34 a.m. She introduced herself and informed him that, before beginning, she would advise him of his rights and must obtain his consent to proceed with the polygraph test. She advised him: "I want to make sure that you know that you're not in custody . . . and you're here on your own free will." *Id.* She further explained that although "it might feel like . . . [he] [could not] go anywhere," he was "free to leave at any time during [the] test." *Id.* at 192. Agent Coyle customarily informs individuals of their *Miranda* rights before a polygraph test, irrespective of whether they are in custody.

She then read aloud a standard "advice of rights" form from a computer screen, which provided:

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

*Id.* at 56, 192–93. Martinez confirmed that he understood his rights, did not have any questions, and electronically signed the form containing this advice of rights.

Agent Coyle then proceeded to read aloud a polygraph consent form, again from a computer screen, which provided:

### AFFILIATION

Before we begin an examination by means of the polygraph in connection with:

the death of Deanna Suazo

you must understand your rights.

### YOUR RIGHTS

You have the right to refuse to take the polygraph test.

9

If you agree to take the polygraph test, you have the right to stop the test at anytime.

If you agree to take the polygraph test, you have the right to refuse to answer any individual question.

## WAIVER AND CONSENT

I have read this statement of my rights and I understand what my rights are. I voluntarily agree to be examined by means of the polygraph during this interview. I understand and know what I am doing. No threats or promises have been used against me to obtain my consent to the use of the polygraph.

I understand that the polygraph examination may be monitored or recorded.

**I understand that any attempt to affect the results of the polygraph examination by intentionally manipulating any physiology, regardless of motivation, will be construed as a polygraph countermeasure. Furthermore, I understand that such attempts, or failure to follow the examiner's instructions, will be deemed as purposeful non-cooperation.**

With the above understanding, I agree to submit to a polygraph examination.

*Id.* at 57, 193. Agent Coyle asked Martinez to read the bolded language aloud, which he did. He did not have any questions about the rights listed in this form and indicated his affirmance by electronically signing it. Martinez reviewed both forms on a computer screen and was not provided with a paper copy of either. The recording was turned off at approximately 10:41 a.m.

**2**

Agent Coyle proceeded to administer an unrecorded pre-polygraph interview, which lasted approximately an hour and a half. During the pre-test interview, Agent Coyle asked Martinez various administrative questions about his background, including health, education, and employment, described what the polygraph would entail, and conducted a practice round. She also said, "something to the effect of, 'if you don't do well, then we will discuss that at the end.'" Aplt. App. II at 95. When Agent Coyle finished the pre-test interview, she offered Martinez the opportunity to use the restroom.

**3**

After Martinez returned unescorted from the restroom, Agent Coyle began the polygraph, which lasted between thirty minutes and an hour. She administered two sets of questions to Martinez. Each set could yield one of three possible results: no deception indicated, inconclusive, or deception indicated.

In the first set, Agent Coyle asked, "Did you do anything to harm De[A]nna that night?" and "Did you participate in harming De[A]nna that night?" Aplt. App. I at 47, 147. The results were inconclusive as to Martinez's truthfulness. Agent Coyle then modified her questions for the second set, asking instead, "Did you do anything to injure De[A]nna that night?" and "Did

11

you participate in injuring De[A]nna that night?" Aplt. App. I at 47, 147. This time, the results indicated deception in Martinez's responses.

**4**

Upon Martinez "failing" the second part of the test, Agent Coyle immediately launched into a post-test interview, turning the recorder back on before she began questioning him. This post-test interview lasted approximately three hours. Agent Coyle began by stating: "So it's completely clear that you weren't being honest with me today. . . . [Y]ou didn't pass the test today. . . . So what we need to talk about is what happened to DeAnna. Okay?" Aplt. App. I at 225. She recognized that he was in a "scary" and "awful" situation and encouraged him to tell the truth out of love for Suazo and her family. *Id.*

Despite Agent Coyle's persistent questioning into what happened the night Suazo died, Martinez repeatedly stated that he did not remember. But he also made several admissions. He admitted: "we probably did argue," that "[Suazo] told me a couple times that she didn't want to be with me," and "I hurt her . . . so bad that I couldn't even get her back, and it's my fault." *Id.* at 234, 236, 239. He also mentioned that he would tell her parents "[t]hat it was an accident," and "I'm taking responsibility that your daughter is . . . gone because it was just us two, and who else to blame but me." *Id.* at 237. As to remembering the details, he professed, "I'm still thinking, and I'm going to own up to it." *Id.*

12

Agent Coyle repeatedly told Martinez that he was a good person, that good people make mistakes, and that he would eventually take responsibility and be forgiven.

Approximately an hour and fifty minutes into the post-test interview, Martinez had not provided any specific information about what had happened to Suazo. At that point, Agent Coyle said, "I'm seeing right through you. . . . I'm seeing through your crap." *Id.* at 242. She told Martinez that he was "completely bullshitting" and he should not "bullshit [her] anymore." *Id.*

Martinez then provided specifics, explaining that "[w]e were together in the car, drinking, being together, and it just went south." *Id.* He continued, "[w]e were arguing" and "I didn't like what she said," because "she didn't want to be with me," so "I took it the wrong way and hurt her." *Id.* While they were arguing, he stated she was yelling at him "to stop and to calm down" and "[k]ept telling me to go to sleep . . . ." *Id.* at 244. He went on, "me being foolish and drunk, I didn't listen to her," and "that's when it happened." *Id.* He was "mad" and "didn't want her to leave," so he "pushed her," causing her to fall on the ground in front of her vehicle. *Id.* at 242–43. At that point, "angry" and "not thinking," he "got in the car and pressed on the gas" and "hit her," after which he went back inside the house. *Id.* at 243–44.

Agent Coyle wanted Martinez to start from the beginning, repeat what happened, and be specific, so he recounted again:

13

[We] [c]ame back home. . . . We ate dinner. She cooked for me. . . . We were eating. . . . We were playing games. She was working. She wanted to play so we started playing together. We were playing for a couple hours because . . . we play a long time on there. Got her music out, her little speaker. We kept playing and drinking. I was in and out. We decided to go outside together to go into her car and continue drinking and listening to music. So we both went out there. We went out there together. We got in her car. We were sitting in there for a long time, talking back and forth. And that's when we started to argue about how things weren't going right or how it -- we wanted to -- how I wanted it to. We started arguing, and I must have switched seats or I went out to the other side, onto the driver's side. We were arguing. Things got out of hand. I -- I pushed her, got on her side, accidentally pressed on the -- on the gas, and I hit her. . . . I felt her. . . . I got out. She was still laying there. I didn't do anything. I was in shock. I didn't want to believe what happened just happened. And that's when I went inside, went inside to my house, did whatever I was doing, went in there, checked on how I was putting wood . . . and then . . . went back out and found her like that. And me not putting two and two together that -- that I did it on accident, I didn't want to believe when I found her.

*Id.* at 245.

At the end of the post-test interview, Agent Coyle gave Martinez some snacks, checked to see if he had enough water, and offered him another opportunity to use the restroom. Martinez asked "when [he would] be able to go," to which Agent Coyle responded that she needed to "talk to the case agent real quick." *Id.* at 247. Agent Coyle then asked Martinez if he wanted to write a statement describing what had happened the night of Suazo's death. When he declined, Agent Coyle left the interview room to allow him to reconsider. When she returned, Martinez repeated that he did not want to write a

14

statement. Shortly thereafter, Agent Cobb entered the interview room and arrested him. Martinez stated that he thought he was going home. The entire process – from when Martinez was first read his *Miranda* warnings to the conclusion of all interviewing – took approximately six hours.

## C[3]

The FBI also undertook additional steps as part of its investigation into DeAnna's death. On November 19, 2021, law enforcement executed a search warrant on Martinez's cell phone. The cell phone data indicated that between July 18 and November 12, 2021, Martinez exchanged 924 text messages with Suazo. The messages included multiple exchanges in which Suazo expressed her desire to end their relationship.[4]

On July 18, 2021 (118 days before Suazo's death), Suazo sent the following text messages to Martinez:

| Suazo | Martinez |
|---|---|
| I am honestly over us. I don't want to spread your birthday with you. I would rather much break up before this weekend. I don't want to be in this relationship as a mentioned a whole bunch of times. I don't think we're moving | |

---

[3] The facts in this section are drawn from three pretrial motions filed by the Government before the district court.

[4] We adopt the Government's format for presenting the text messages and do not include any [sic] notations in any of the messages despite potential errors.

| forward, I think the both of us are growing apart. | |
|---|---|
| *spend* | |

Aplt. App. I at 131. He did not respond via text message.

On July 23, 2021 (113 days before Suazo's death), Suazo and Martinez exchanged the following text messages:

| Suazo | Martinez |
|---|---|
| I'm done. | |
| We're done | |
| | I'm walking back home |
| | Already told my parents |
| Ok so you told we're officially done? Because we are. | |
| | That you got all hurt because I was smoking a cigarette |

*Id.* at 132.

On August 28, 2021 (77 days before her death), Suazo and Martinez exchanged the following text messages:

| Suazo | Martinez |
|---|---|
| Your sister and I tried helping you out and you denied that so… night | |
| Stop calling me with threats | |
| | Walking home |
| | I'm outside |

*Id.*

16

On September 9, 2021 (65 days before Suazo's death), Suazo sent Martinez this lengthy text message, to which Martinez responded the following day:

| Suazo | Martinez |
|---|---|
| I am officially breaking up with you. I would say this in person or even a call, but your aggressive behavior makes me tell you this via text. You can't handle your drink, you go above your limit each time and I end up as "the bad person" for trying to help you monitor your drinking. It's not fun anymore, it's a huge burden and I'm past those days. We both have better things and responsibilities to take care of.<br><br>Also, it's really lame that you try to cheat with much younger females, aka it's against the law. I can't help you or be by your side defending you anymore. Take care of yourself before taking care of others. Also seek the help you need through the people you love in your fam. I'm stepping away. | |
| | We're on our way now babe I love you so much and can't wait to be there with you [heart emoji] be careful on your way down |

*Id.* at 132–33.

On September 26, 2021 (48 days before Suazo's death), Suazo and Martinez exchanged these text messages:

17

| Suazo | Martinez |
|---|---|
| I have it, we are done broken up!<br><br>I offered my help all night into the morning and YOU decided to deny that. | |
| It's not my fault that you can't handle your alcohol, you didn't want to leave with me last night, when I was practically begging you | |
| | Whatever I walked all this morning |
| We're done. I'm not going to argue with someone who doesn't appreciate me. I'm blocking you. | |
| | Whatever go ahead |
| I've been trying to reach you all night | |
| | Sure you did. Look at all my texts to you!?! |
| Ok, fine, we're done. Im done putting up with you and your behavior. I don't need this or you. | |
| | You'd be the same damn way |
| | Whatever |
| | Yeah you don't need me |
| Yea I don't. Bye. | |
| | Obviously you didn't care last night |
| | Bye! |
| | Uh huh sure you didn't fucking care |
| So bye | |
| I'm done arguing to a brick wall. Bye. We're done. | |
| | Yeah helped by me walking this morning |
| Drive safe, and I'll get my stuff out this week. | |

18

| | Yeah I'll take it out |
|---|---|
| I don't need your aggression, I'll do myself and be out of your way. | |

*Id.* at 133–34.

On November 5, 2021 (eight days before Suazo's death), Suazo and Martinez exchanged the following text messages:

| Suazo | Martinez |
|---|---|
| I'm not saying this because I'm mad. I'm saying this because it's how I've been feeling for a long time now. We really need to take time from each other. I'm not in the right place to be in a relationship with you. | |
| | I'm sorry [Suazo] all I asked was to tie my hair. I'll learn how so you don't have to worry. Not going to argue about this and if you don't want to stay around me then you don't have to. |
| It's not about your hair, it's about how we argue or get mad at every little thing. It's not just me but it's also you too.<br><br>I'm not happy anymore. Even when we try to have fun usually something happens between us, and that reinsurers that I'm not happy. | |
| | I wasn't the one getting mad this morning. We'll if your not happy then |
| It's both of our attitudes, when I helped you find your phone you could have said "thank you." | |

19

| | |
|---|---|
| Instead you just walked out of the house.<br><br>I need time to work on my priorities, my work and school. Being around you everyday prevents me from doing that. | |
| | I know my attitude is bad and I'm going to work on controlling it. Sorry I didn't say anything cause I was already 20 minutes late. Okay I understand that, if I prevent you then shouldn't be with me. |
| | I'm sorry [Suazo] |

*Id.* at 134.

Lastly, on November 5, 2021 (seven days before Suazo's death), Suazo

and Martinez exchanged the following text messages:

| Suazo | Martinez |
|---|---|
| This photo makes it very clear for me to end this relationship. You pretended to be single around this time last year. Now you can have what you really wanted, being single.<br><br>[Suazo attached a photo of a screenshot of Martinez's phone in which Martinez received a sexual picture of another female] | |
| There's a cop up here. | |
| Going next door. | |
| | I don't think that was the cops looked like my uncles brown truck. |

*Id.* at 174.

20

Additionally, FBI agents interviewed friends and family of Suazo and Martinez following Suazo's death. From these interviews, the Government learned from multiple witnesses of an incident approximately eleven months before Suazo's death, where Martinez pinned her down and strangled her to prevent her from leaving his home. According to the witnesses, Martinez's parents had to intervene to help Suazo escape.

## II

On December 21, 2021, a grand jury in the United States District of New Mexico returned an indictment charging Martinez with one count of second-degree murder in Indian Country, in violation of 18 U.S.C. §§ 1111(a) and 1153. He pleaded not guilty at an arraignment held on December 30, 2021.

In anticipation of trial, the parties filed pretrial motions. On March 1, 2023, Martinez filed a motion to suppress the statements he made during the post-polygraph interview. Therein, Martinez argued that law enforcement should have re-*Mirandized* him before the post-polygraph interview, contending that the initial *Miranda* advisement given prior to the polygraph was insufficient for the subsequent interrogation because he was unaware there would be additional questioning at the end of the polygraph test.

On March 21 and May 2, 2023, the Government filed two related motions in limine to admit into evidence seven text message exchanges between Suazo

21

and Martinez in which Suazo discussed breaking up with Martinez. The Government argued they were seeking to admit the messages for a non-hearsay purpose in compliance with Rule 801(c)(2), as they were not being offered for the truth of the matter asserted – that Suazo actually intended to break up with Martinez – but for their effect on Martinez, the recipient. Specifically, the messages were intended to demonstrate, amongst other things, Martinez's belief that Suazo wanted to end their relationship, thereby providing him with a motive for murder.

On April 3, 2023, the Government filed a notice of intent pursuant to Rule 404(b) seeking to elicit witness testimony of a prior instance of physical abuse perpetrated by Martinez against Suazo.

The district court held a hearing on the motions on October 26, 2023. In three separate written orders, issued on November 30, December 5, and December 7, 2023, the district court granted Martinez's motion to suppress and denied the Government's motions.

The Government now appeals those rulings in this interlocutory appeal. "An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence . . . in a criminal proceeding," provided "the defendant has [not] been put in jeopardy and before the verdict or finding on an indictment or information," so long as "the United States attorney certifies to the district court that the appeal is not taken for

purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." 18 U.S.C. § 3731. Here, the Government filed three separate notices of appeal, challenging each of the aforementioned written orders by the district court. For each notice of appeal, the United States Attorney certified that "this appeal is not taken for purpose of delay and that the excluded evidence is a substantial proof of a fact material in this proceeding." Aplt. App. II at 266–68. Accordingly, we have jurisdiction to review these timely appeal.

### III

We now turn to whether the district court erred in excluding as evidence in Martinez's impeding trial: (1) his post-polygraph statements to the FBI, (2) text messages between Suazo and Martinez in which she discussed ending their relationship, and (3) witness testimony of a prior act of violence perpetrated by Martinez against Suazo.

### A

First, the Government argues that the district court erred in suppressing Martinez's post-polygraph statements by ruling that Martinez had been "constitutionally entitled to a new advisement of his *Miranda* rights prior to the post-test interview." Op. Br. at 18 (quoting Aplt. App. II at 246). Specifically, the Government contends that Martinez validly waived his Fifth Amendment privilege to remain silent before the polygraph, there was no

23

significant change in circumstances that would have required re-*Mirandizing* him before the post-polygraph interview, and that his confession was voluntarily made. According to the Government, the district court misapplied the totality of the circumstances test, as none of the factors identified by the district court justified the suppression of Martinez's statements.

**1**

We review de novo the legal question of whether the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008). Moreover, we review the district court's underlying factual findings for clear error. *United States v. Warrington*, 78 F.4th 1158, 1166 (10th Cir. 2023). We will reverse a district court's findings of fact "only if they are without factual support in the record" or if we, "considering all the evidence, [are] left with a definite and firm conviction that a mistake has been made." *United States v. Cortes-Gomez*, 926 F.3d 699, 708 (10th Cir. 2019). As a court reviewing the record on appeal, we must consider the evidence adduced at the suppression hearing in the light most favorable to the prevailing party, here, Martinez. *United States v. Young*, 964 F.3d 938, 942 (10th Cir. 2020).

**2**

The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against

himself . . . ." U.S. Const. amend. V. Whenever a question arises regarding the validity of a defendant's waiver of their right against self-incrimination, the issue is governed by this portion of the Fifth Amendment.

In *Miranda v Arizona*, the Supreme Court explained that an individual's Fifth Amendment privilege against self-incrimination is "jeopardized" when they are in custody and subjected to questioning. 384 US 436, 478 (1966). Thus, the Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. That is, a person subject to custodial interrogation must be given specific rights advisements and warnings designed to safeguard their Fifth Amendment rights. *Id.* at 444–45.

A proper *Miranda* warning does not require magic words. *Duckworth v. Eagan*, 492 U.S. 195, 202–03 (1989) ("We have never insisted that *Miranda* warnings be given in the exact form described in that decision."). Rather, the warning must reasonably inform an individual in custody of the following: (1) the right to remain silent, (2) that any statement may be used against them in court, (3) the right to have an attorney present during questioning, and (4) the right to have an attorney appointed if they cannot afford one. *Id.*

25

Law enforcement officials are not required to issue *Miranda* warnings to every person they arrest or question – only those subject to "custodial interrogation." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). A suspect is "in custody" for purposes of *Miranda* when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a "'restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Mathiason*, 429 U.S. at 495). Further, "interrogation" refers not only to express questioning but also to any words or actions on the part of the police – other than those normally attendant to arrest and custody – that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

The defendant bears the initial burden of establishing they were subject to custodial interrogation. *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir. 1986) (holding that the defendant "ha[s] the burden of proving that he was under arrest or in custody"); *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (same); *United States v. Woodson*, 30 F.4th 1295, 1302 (11th Cir. 2022) (same). Once the defendant establishes a prima facie case of custodial interrogation, the burden shifts to the Government to establish by a preponderance of the evidence that any waiver of the defendant's Fifth

Amendment privilege comported with the requirements of *Miranda* and its progeny. *Miranda*, 384 U.S. at 475. If the defendant did not voluntarily, knowingly, and intelligently waive their rights, *Miranda* prevents statements obtained during a custodial interrogation from being used at trial. *Id.* at 471–73.

**3**

On appeal, the Government does not contest the district court's legal conclusion that Martinez was in custody during the post-polygraph interview. Thus, primarily at issue is whether the Government has met its burden of demonstrating that Martinez validly waived his *Miranda* rights in connection with the post-polygraph interview.

"[A] suspect may waive [their] Fifth Amendment privilege, 'provided the waiver is made voluntarily, knowingly and intelligently.'" *Colorado v. Spring*, 479 U.S. 564, 572 (1987) (quoting *Miranda*, 384 U.S. at 444). To be voluntary, the relinquishment must be the "product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* at 573 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

To be knowing and intelligent, the waiver "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quoting *Moran*, 475 U.S. at 421). Put simply, the suspect must comprehend the meaning of the words in

27

the warning. *Id.* at 574. The "Constitution does not require that a criminal suspect know and understand *every* possible consequence of a waiver of the Fifth Amendment privilege." *Id.* (emphasis added). Rather, they need only be made aware of their options: (1) they "may choose not to talk to law enforcement officers," (2) "talk only with counsel present," or (3) "discontinue talking at any time." *Id.*

Moreover, a waiver need not be expressly given; it may be implied if the suspect understands their rights and engages in a course of conduct indicating waiver. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). In sum, a Fifth Amendment waiver is only valid if the "totality of the circumstances . . . reveal both an uncoerced choice and the requisite level of comprehension . . . ." *Spring*, 479 U.S. at 573 (quoting *Moran*, 475 U.S. at 421).

This appeal raises two questions: (1) whether a suspect's signed waiver provided in response to *Miranda* warnings given prior to a polygraph test – without clear mention that a post-polygraph interview could follow – is limited in scope to just the polygraph test; and (2) whether *Miranda* warnings given before a polygraph test become stale or ineffective by the time of or during a post-polygraph interview, such that the suspect should have been re-*Mirandized*. We address each issue in turn.

28

**4**

The first issue concerns whether Martinez's executed waiver of his Fifth Amendment privilege was valid and, if so, whether it was limited in scope to only the polygraph test, excluding the post-polygraph interview. In his motion to suppress before the district court, Martinez challenged the validity of any purported waiver of his rights, asserting he never voluntarily, knowingly, or intelligently waived them. *See* Aplt. App. I at 54 ("Any waiver of Mr. Martinez' Fifth Amendment rights was not knowing and voluntary based on the totality of the circumstances.").

Martinez's challenge to the voluntariness of the signing and execution of the rights advisement and waiver – i.e., that it resulted from intimidation, coercion, or deception, *Spring*, 479 U.S. at 572 – cannot be credibly made. There is no evidence, for example, that Agent Coyle committed or threatened to commit any act of violence against Martinez,[5] handcuffed or restrained him,

---

[5] Involuntary confession cases offer useful insights on voluntariness. *See, e.g., Beecher v. Alabama*, 389 U.S. 35, 36–37 (1967) (per curiam) (concluding confession involuntary where police held a gun to the suspect's head and subsequently shot at him before extracting a confession); *Payne v. Arkansas*, 356 U.S. 560, 566–67 (1958) (concluding confession involuntary where the police threatened the suspect with mob violence); *Brown v. Mississippi*, 297 U.S. 278, 284–86 (1936) (concluding confession involuntary where suspects were brutally whipped and tortured until they confessed).

deprived him of food, water, or restroom breaks,[6] or made any threats, promises, or inducements to him[7] in an effort to obtain the waiver of his rights.

That leaves us with the questions of whether his executed waiver was knowing and intelligent, and whether it was limited in scope to only the polygraph test. *Id.* Martinez asserted before the district court that his waiver was not knowing and intelligent, in part, because the "*Miranda* warning that [Agent] Coyle administered to [him] was a standard advice of rights and did not indicate that he would be subject to a post-polygraph examination." Aplt. App. I at 54.

Recall that Martinez initially proposed and later voluntarily agreed to undergo a polygraph test. Once in the polygraph-testing room, Agent Coyle

---

[6] *See, e.g., Culombe v. Connecticut*, 367 U.S. 568, 622–23 (1961) (concluding confession involuntary where suspect was deprived of adequate food, rest, and human contact); *Payne*, 356 U.S. at 564, 567–68 (concluding confession involuntary where suspect was deprived of food for over 24 hours); *Chambers v. Florida*, 309 U.S. 227, 231, 238–41 (1940) (concluding confession involuntary where the suspect was held in extended detention without adequate food or rest).

[7] *See, e.g., Arizona v. Fulminante*, 499 U.S. 279, 287–88 (1991) (concluding confession involuntary where a government informant promised the suspect protection from physical harm in exchange for the confession); *Lynumn v. Illinois*, 372 U.S. 528, 533–34 (1963) (concluding confession involuntary where the police threatened the suspect with losing custody of her children and welfare benefits if she did not cooperate); *Spano v. New York*, 360 U.S. 315, 323–34 (1959) (concluding confession involuntary where police used the suspect's close childhood friend, who was a police officer, to suggest that the officer would be fired if the suspect did not cooperate).

introduced herself, informed Martinez that she would advise him of his rights, and told him that she needed his consent to proceed with the polygraph test. She then read aloud a standard advice of rights form, which Martinez confirmed he understood, had no questions about, and electronically signed. The rights form advised Martinez of his *Miranda* rights and hit all the marks *Miranda* and its progeny require. *See Duckworth*, 492 U.S. at 202–03. Following the initial advisement of rights, Agent Coyle read aloud a polygraph consent form, which Martinez also read a portion of aloud and then electronically signed. At this point, Martinez had not been told explicitly that there could be an interview after the polygraph test; however, he also had not been assured that one would not occur.

To determine whether the waiver was knowing and intelligent, we consider the totality of the circumstances, including the defendant's "age, experience, education, background, and intelligence," amongst other characteristics, to determine "whether [they] ha[d] the capacity to understand the warnings given [to them], the nature of [their] Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

The focus of our inquiry is whether Martinez had the *capacity* to understand the *rights he was waiving*, not whether he understood how the interrogation would be conducted. *Spring*, 479 U.S. at 577 ("[A] suspect's

31

awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege."). Police are not required to inform a suspect of what questions they plan to ask, how long the questioning will take, who will be asking the questions, or any other specifics for a waiver to be knowing and intelligent. In this context, an advice of rights form is not required to "ma[k]e it clear to the [suspect] that [they are] not merely taking a polygraph examination but [are also] going to be asked questions about a specific offense under investigation." *United States v. Gillyard*, 726 F.2d 1426, 1429 (9th Cir. 1984).

Martinez does not argue that he did not have the capacity to understand his options – i.e., (1) "choose not to talk to law enforcement officers," (2) "talk only with counsel present," or (3) "discontinue talking at any time." *Spring*, 479 U.S. at 574. Nor is there any allegation that he misunderstood the consequences of speaking freely to law enforcement. As stated, not only were his rights read to him, but he also read a portion of the polygraph rights advisement aloud, stated affirmatively he understood his rights, and signed the form to indicate his waiver of the rights listed. Thus, we conclude that Martinez's post hoc claim that he was unaware there was a possibility of further questioning after the polygraph test did not affect his ability to *comprehend* the meaning of the warnings he was given at the outset.

32

Still, if the officers or the rights advisement itself, implicitly or explicitly, create the impression that the defendant's *Miranda* rights apply only to certain phases of questioning or under specific conditions, it could limit the *scope* of the defendant's valid waiver.

Martinez argues that at the time he was advised of these rights, he was not informed that there could be a post-polygraph interview. Because he was unaware of the possibility of additional questioning after the polygraph test, he argues any valid waiver does not extend in scope to the post-polygraph interview. The district court agreed and concluded that by signing the rights advisement form, "Martinez did not knowingly and intelligently relinquish his rights *in connection with the post-test interview*." Aplt. App. II at 238 (emphasis added).

This argument is unavailing for two reasons. First, neither Agent Coyle nor the advisement of rights form suggested or indicated that Martinez's Fifth Amendment privilege could be invoked only during the pre-polygraph interview or polygraph test. Second, "it would have been unreasonable for [Martinez] . . . to assume that [he] would not be informed of the polygraph readings and asked to explain any unfavorable result."[8] *Wyrick v. Fields*, 459 U.S. 42, 47 (1982) (per curiam).

---

[8] Even if this language in *Fields* is dicta, we are "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly

Accordingly, we hold that Martinez's signed waiver of his Fifth Amendment rights was voluntary, knowing, and intelligent and was not limited in scope to only the polygraph test. The district court erred in concluding otherwise.

**5**

Nevertheless, a valid initial waiver does not extend indefinitely. The district court held that "Martinez was constitutionally entitled to a new advisement of his *Miranda* rights prior to the post-test interview." Aplt. App. at 246. Because he was not provided with "renewed warnings," "the post-test interview was conducted in violation of Mr. Martinez's Fifth Amendment rights and, as a result, the content of the post-test interview, and all statements made by Mr. Martinez" were suppressed by the district court. *Id.* Here lies the heart of this appeal.

In certain circumstances, a suspect must be readvised of their *Miranda* rights and reaffirm their waiver, as the warnings can become "stale" if changing circumstances diminish their effectiveness. *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1128–29 (9th Cir.), *amended*, 416 F.3d 939 (9th Cir. 2005). The Supreme Court, however, has rejected a per se rule

---

when the dicta is recent and not enfeebled by later statements." *United States v. Serawop*, 505 F.3d 1112, 1122 (10th Cir. 2017) (quoting *United States v. Nelson*, 383 F.3d 1227, 1232 (10th Cir. 2004)).

requiring a suspect to be readvised of their rights in specific situations, instead favoring a flexible approach that focuses on the totality of the circumstances. *See Fields*, 459 U.S. at 48–49 (per curiam) (rejecting per se rule requiring police to readvise suspect of their rights before questioning them about the results of a polygraph examination). Because it so closely aligns with the facts before us, *Fields* deserves a closer look.

In 1982, the Supreme Court in *Fields* considered whether a defendant needed to be readvised of his *Miranda* rights after completing a polygraph examination. 459 U.S. at 46–47. Before initiation of the test, Fields received a written consent document informing him of his *Miranda* rights, which he waived in writing. *Id.* at 44. At the conclusion of the polygraph examination, which took less than two hours, the examiner told Fields "there had been some deceit, and asked him if he could explain why his answers were bothering him." *Id.* Fields then made several admissions, which he later sought to suppress. *Id.* at 44–45. *Fields* is on-point, factually and legally, to this case.

In a per curiam decision, the Supreme Court held that the police did not need to readvise Fields of his *Miranda* rights as he had continued to make a voluntary, knowing, and intelligent waiver. *See id.* at 49. The Court concluded *Miranda* warnings remain effective for subsequent questioning unless "the circumstances change[] so seriously that [the suspect's] answers no longer were voluntary, or unless [the suspect] no longer was making a 'knowing and

35

intelligent relinquishment or abandonment' of [their] rights." *Id.* at 47 (quoting *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)).

Accordingly, we apply a totality of the circumstances test when determining whether a subsequent interrogation (whether in the polygraph context or not) requires officers to readvise the suspect of their *Miranda* rights and obtain a new waiver. *See id.* at 48. First, we ask whether – at the time the initial *Miranda* warnings were provided – the defendant knew, understood, and validly waived their rights and this waiver was not limited in scope. *Id.* If so, we then consider whether anything occurred between the warnings and the defendant's statements that rendered the defendant unable to fully and properly evaluate the effect of exercising or waiving those rights before making a statement to law enforcement. *See id.* at 47.

Because we have already held that Martinez's executed waiver of his Fifth Amendment privilege was voluntary, knowing, and intelligent and was not limited in scope, we must now consider whether circumstances changed so significantly between his (a) initial waiver and the polygraph test and (b) the post-polygraph interview that he was required to be re-*Mirandized* and provide a new waiver before the post-polygraph interview.

Our court has yet to address which factors should be evaluated in making this determination. We find several factors relevant to this inquiry: (1) the passage of time between the initial rights waiver and the subsequent

36

interrogation, (2) any material changes in the location or environment between the initial and subsequent interrogation, (3) whether the subject matter of the questioning changed or shifted between the initial and subsequent interrogation, (4) whether the suspect was made aware that follow-up questions or another interrogation could occur, and (5) any other circumstances suggesting that the effectiveness of the earlier *Miranda* warning had diminished by the time of the subsequent interrogation.[9]

*Passage of time.* First, we consider the passage of time between the initial waiver and the subsequent interrogation, including whether there were any significant breaks or interruptions. As time elapses between an initial waiver and a subsequent interrogation, a suspect's ability to recall and understand

---

[9] Other circuits have identified the following as the most significant factors to consider when determining whether a suspect who was *Mirandized* before a polygraph must be re-*Mirandized* before a post-polygraph interview: (1) who initiated the post-polygraph questioning, (2) whether the defendant has consulted with counsel, and (3) whether the signed waiver clearly specifies that it applies to post-polygraph questioning or only to the polygraph test. *See United States v. Leon-Delfis*, 203 F.3d 103, 111 (1st Cir. 2000); *United States v. Johnson*, 816 F.2d 918, 921 n.4 (3d Cir. 1987); *United States v. Gillyard*, 726 F.2d 1426, 1429 (9th Cir. 1984).

We decline to adopt the first two factors because they do not necessarily reflect whether the suspect's understanding of their rights or the voluntariness of their waiver was affected by any meaningful *change in circumstances* between the polygraph and post-polygraph interrogation. So too, the third factor speaks to the existence and scope of any waiver – specifically whether the signed waiver was broad enough to cover both the polygraph and any follow-up questioning – rather than on whether subsequent events impacted the suspect's ability to understand or voluntarily maintain the waiver.

their *Miranda* rights might diminish. However, "the passage of time alone [does not] invalidate[] previously given *Miranda* warnings." *Mitchell v. Gibson*, 262 F.3d 1036, 1057 (10th Cir. 2001). "Courts have consistently upheld the integrity of *Miranda* warnings even in cases where 'several hours' have elapsed between the reading of the warning and the interrogation." *Id.* at 1057–58 (quoting *United States v. Frankson*, 83 F.3d 79, 83 (4th Cir. 1996)).

Here, there was no break in time between the advisement of his rights, the pre-polygraph interview, the polygraph test, and the post-polygraph interrogation. The advisement of rights and waiver took less than 10 minutes, the pre-polygraph interview lasted about an hour and a half, the polygraph test itself ranged between thirty minutes to an hour, and the post-polygraph interview extended for approximately three hours. Altogether, from the time Martinez was given his *Miranda* warnings and waived these rights to the conclusion of all questioning, the entire process spanned roughly six hours. Less than three hours elapsed between his advisement of rights and the start of the post-polygraph interview. This relatively short time frame suggests that the initial advisement of rights remained fresh throughout the process.

*Changes in the environment.* When considering whether there were changes in the location or environment between the initial and subsequent interrogation, *see id.* at 1058 (analyzing "whether the character of the interrogation had changed significantly"), we examine, inter alia, whether the

38

initial and subsequent interrogations occurred in the same location, whether the same law enforcement personnel conducted both interrogations, and whether the same individuals were present during both interrogations. A change in the location or environment may lead to a significant change in circumstances because it might alter the psychological or emotional state of the suspect, which could make them more likely to forget, confuse, or misunderstand their rights.

Here, both the polygraph test and post-polygraph interview took place in the same room and were conducted by the same person, Agent Coyle, with only Martinez and Agent Coyle present the entire time. These facts indicate continuity rather than a significant shift in the interrogation environment.

*Subject matter of the questioning.* We also evaluate whether the subject matter of the questioning changed or shifted between the initial and subsequent interrogation. *See id.* (examining "whether the questions put to the defendant subsequently would have caused him to forget the rights of which he had been advised and which he had previously understood").

Here, during both the polygraph examination and the post-polygraph interview, the subject matter of the questioning remained the same – Martinez was fully aware that he was being asked about, and then accused of, causing Suazo's death. The consistent focus on the same subject matter throughout the questioning demonstrates no substantial change in circumstances.

39

*Awareness of follow-up interrogation.* Additionally, we consider whether the suspect was informed in advance that follow-up questions or further interrogation could take place. Awareness of a follow-up interrogation reduces the likelihood that the subsequent questioning would feel like a distinct or separate event, thereby preserving the effectiveness of the initial *Miranda* warnings and waiver of rights.

Here, Agent Coyle told Martinez during the pre-polygraph interview, "something to the effect of, 'if you don't do well, then we will discuss that at the end,'" Aplt. App. II at 95, putting Martinez on notice that subsequent questioning could occur. Like *Miranda* warnings, magic words are not required to put a suspect on notice that follow-up questions or interrogation may be forthcoming. That is especially true when, as here, the agent concludes the suspect provided deceptive responses during the polygraph test. Just as in *Fields*, "it would have been unreasonable for [Martinez] . . . to assume that [he] would not be informed of the polygraph readings and asked to explain any unfavorable result." 459 U.S. at 47.

*Any other circumstances.* Lastly, we consider any other circumstances suggesting that the effectiveness of the earlier *Miranda* warning had or had not diminished by the time of the subsequent interrogation. *Rodriguez-Preciado*, 399 F.3d at 1129. In support, Martinez points to the five factors the

40

district court found indicative of a change in circumstances. We address each in turn.

First, the district court determined that Martinez's status as a "young man who had no previous exposure to the criminal justice system," and who was not represented by counsel, weighed in favor of a change in circumstances. Aplt. App. II at 238 (quoting *United States v. Johnson*, 816 F.2d 918, 921 n.4 (3d Cir. 1987)). Yet these facts pertain more to whether Martinez's initial waiver was knowing and voluntary, rather than whether there was a subsequent change in circumstances. Relevant to our inquiry, Martinez's age of 29 does not necessarily qualify him as young. And while he may not have been represented by counsel, that was of his choosing. He first spoke to FBI agents the morning of Suazo's death and was not reapproached about a subsequent interview until more than a week later. Either way, his age and status as unrepresented by counsel remained unchanged for the duration of his time at the Taos Police Department.

Second, the district court concluded there was a change in circumstance because Martinez was never advised, either orally or in writing, prior to signing the advice of rights form that post-examination questioning was a possibility. However, before the polygraph test, Agent Coyle told Martinez, "something to the effect of, 'if you don't do well, then we will discuss that at the end.'" Aplt. App. II at 95. Moreover, this argument is foreclosed by *Fields*. 459

41

U.S. at 47 ("[I]t would have been unreasonable for Fields and his attorneys to assume that Fields would not be informed of the polygraph readings and asked to explain any unfavorable result."). Thus, this fact is unpersuasive.

Third, the district court pointed to the fact that although Martinez initially raised the possibility of a polygraph, it was the FBI agents who took the concrete steps to arrange it. This fact is both obvious and mostly irrelevant. The Government has the duty to investigate crimes, so naturally it arranged the polygraph test because it has both the polygraph machine and the polygrapher. This fact does little to explain any change in the circumstances or conditions under which Martinez initially waived his rights.

Fourth, the district court highlighted that Agent Coyle, not Martinez, initiated the post-test interview. While who initiated the subsequent interrogation can be relevant to whether a suspect implicitly waived their rights – since initiating contact can be seen as a course of conduct indicating waiver, *see Butler*, 441 U.S. at 373 – it again does not address whether the conditions under which the suspect initially waived their rights had changed.

Lastly, the district court emphasized that Agent Coyle "effectively switched her role from that of neutral test administrator to an interrogator" who refused to accept Martinez's claimed loss of memory, who proposed her own facts, and who employed an "unrelentingly aggressive and accusatory post-test questioning" for "over three hours . . . ." Aplt. App. II at 242–44. The

42

Government asserts that these factual findings characterizing the post-polygraph interview were erroneous.

We agree. This characterization of the interview assumes, without basis in the record, that Agent Coyle was ever "neutral" such that her role switched while she was in the room with Martinez. Agent Coyle works for the FBI to conduct interviews and polygraph examinations. Although objectivity should be central to her role as a criminal investigator, no reasonable person in Martinez's position would or should conclude that an FBI Agent is simply a "neutral test administrator . . . ." Aplt. App. II at 242. This is particularly true after she advised him of his *Miranda* rights and informed him that FBI agents wanted to discuss Suazo's death, where, by Martinez's account, he was the only person present when she died.

Moreover, the shift in the tone and manner of questioning may have represented a change in conditions but, in light of the other circumstances just discussed, it was not significant enough to cause Martinez to forget or misunderstand his initial rights. After all, it is unsurprising that a polygraph test would be conducted in a less accusatory manner than a subsequent post-polygraph interview.

Considering the totality of the circumstances, merely "[d]isconnecting the polygraph equipment effectuated no significant change in the character of the interrogation," and "would not have caused [Martinez] to forget the rights

43

of which he had been advised and which he had understood moments before." *Fields*, 459 U.S. at 47, 49. Therefore, we hold that the district court erred in suppressing Martinez's post-polygraph statements on the grounds that he was required to be re-*Mirandized* and his waiver reaffirmed before the post-polygraph interview.

**6**

As a last resort, Martinez alternatively argues that his post-polygraph statements were made involuntarily or were the product of coercion. Although this argument was not presented to the district court in his motion to suppress, Martinez asserts we "may affirm [the district court] for any reason supported by the record." Resp. Br. at 53 (quoting *United States v. Myers*, 362 F.3d 667, 674 n.7 (10th Cir. 2004)) (alteration in original). We decline to consider this new argument raised by Martinez for the first time on appeal, particularly as this case is in the pretrial phase and the district court has not been provided an opportunity to address it in the first instance.

**B**

In the second appeal, the Government argues that the district court erred in excluding text messages from Suazo to Martinez, in which she repeatedly expressed her intent to break up with him, on hearsay grounds per Rule 801(c). The Government asserts that these messages show their impact

on Martinez as the listener, rather than prove Suazo actually intended to end the relationship. That effect, according to the Government, is his potential motive or intent to harm Suazo in response to her expressed desire to leave him. Additionally, the Government sought to introduce this evidence to contradict Martinez's claim that on the morning of her death the couple was "fine" and had no issues. Op. Br. at 19–20 (quoting Aplt. App. I at 135).

**1**

"We review a district court's evidentiary rulings for an abuse of discretion, considering the record as a whole." *United States v. Ledford*, 443 F.3d 702, 707 (10th Cir. 2005). A district court abuses its discretion when its decision is "arbitrary, capricious or whimsical" or when it commits legal error. *United States v. Shumway*, 112 F.3d 1413, 1419 (10th Cir. 1997) (quoting *United States v. Wright*, 826 F.2d 938, 943 (10th Cir. 1987)). We will not reverse an evidentiary determination that "falls within the 'bounds of permissible choice in the circumstances.'" *Id.* (quoting *United States v. Dorrough*, 84 F.3d 1309, 1311 (10th Cir. 1996)).

**2**

The Federal Rules of Evidence define "hearsay" as a statement that "the declarant does not make while testifying at the current trial or hearing . . . offere[d] in evidence to prove the truth of the matter asserted in the

45

statement." Fed. R. Evid. 801(c). Hearsay is generally inadmissible unless it falls within a specific exception to the hearsay rule. Fed. R. Evid. 802.

However, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c) advisory committee's note to 1972 proposed rules. Thus, "[w]e have long held that a statement offered to establish its effect on the listener is not hearsay." *United States v. Murry*, 31 F.4th 1274, 1292 (10th Cir. 2022). Statements admitted for this purpose can be relevant to proving the intent, knowledge, beliefs, motivation, or any other reaction of the person who heard it. *See* 30B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6719 (3d ed. 2024). For example, such statements can explain "why the listener acted as [they] did." *United States v. Churn*, 800 F.3d 768, 776 (6th Cir. 2015); *accord* 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8:20 (4th ed. 2024) ("Sometimes the point is to explain why a person behaved as [they] did, since words read in print or heard in conversation can motivate or inform the person who reads them or hears them spoken.").

**3**

The district court excluded the messages on the basis that they "'invite[d] the jury to accept as true' [Suazo's] statements of her intent to break up with Mr. Martinez." Aplt. App. II at 252 (quoting *United States v. Graham*, 47 F.4th

46

561, 567 (7th Cir. 2022)). Because Martinez "either did not respond at all, responded but did not address the portions of her messages that indicated her intent to end their relationship, or apologized and even agreed that she should not be with him if she was unhappy," the district court determined that the messages could not have been offered to show that they caused him to develop the motive or intent to kill her and were instead being offered to show that she wanted to break up with him. *Id.* The district court, therefore, ruled that the messages were inadmissible hearsay. *Id.* at 254.

The Government disputes that it sought to admit the text messages for the truth of the matter asserted, or in other words, "that [Suazo] actually intended to break up with [Martinez]." Op. Br. at 19 (quoting Aplt. App. I at 130). We agree that the text messages were not offered for a hearsay purpose and hold that the district court erred in excluding them as inadmissible on this basis.

First, for these statements to be admissible, it is not necessary for the Government to prove that Suazo genuinely intended to break up with Martinez. Rather, the evidentiary value lies in the fact that her phone communicated this information to his phone. Hypothetically, even if someone else had taken Suazo's phone and written all the pertinent messages, the effect on Martinez would still be the same.

47

Second, the district court erred as a matter of law by requiring the Government to produce evidence of Martinez's responses to the messages to establish their effect on him as the listener. For the "effect on the listener" exception to be applicable, it is sufficient that the listener received the information and that it had some impact on them. *See, e.g, United States v. Farley*, 992 F.2d 1122, 1125 (10th Cir. 1993) (holding that child sex abuse victim's statements to sibling that "[defendant] is going to get you. He's a bad man," as overheard by their mother, could be used to explain the mother's suspicion and decision to question the victim); *United States v. Morales-Macias*, 855 F.2d 693, 695 (10th Cir. 1988) (holding that witness's testimony that his brother instructed him to go to a bar in El Paso to meet a man who would take him to Albuquerque for $500 was properly offered to explain why the witness went to the bar and rode in the man's vehicle); *United States v. Twitty*, 689 F. App'x 890, 893–95 (10th Cir. 2017) (unpublished)[10] (holding that redacted court orders, which defendant referenced in threatening letters he sent to court staff and related parties, were not hearsay because the redacted orders were not offered to prove the truth of the statements in the orders but to show the effect on the defendant, to establish his intent to send threatening communications, and to provide context for the letters).

---

[10] Unpublished decisions are cited for their persuasive value only and are not binding precedent from this Court. 10th Cir. R. 32.1(A).

The effect may manifest in the listener's mind or actions, whether through verbal communication or non-verbal behavior. Moreover, the effect does not necessarily have to occur close in time to when the statement was made. What is more, we have never required the proponent of the statement to prove that the listener responded directly to or acknowledged – in writing or otherwise – the original message.

The relevant inquiry is whether the evidence supports reasonable inferences about how the statements influenced the listener's state of mind, decisions, or actions in a way that is pertinent to the case. The proponent of the statement does not need direct evidence that the statement caused the effect, such as the listener explicitly saying they felt a certain way or took a particular action because of the statement. Rather, causation can be inferred through reasonable inferences.

The district court noted that in response to Suazo's messages indicating her desire to end the relationship, Martinez either did not respond, responded without addressing her intent to break up, or showed contrition by agreeing that she should not stay with him if she was unhappy. As a result, the district court indicates that the Government's actual intent in using these messages is to suggest a different effect on Martinez that is not supported by his responses to Suazo's messages. The district court was concerned that the Government

49

was attempting to infer a motive or emotional state (such as distress or anger) from the text messages that Martinez's text responses may not substantiate.

Noting this concern, the most reasonable inference to make from reading the text messages is that they represent only a part of the communications between Suazo and Martinez. There were implicitly additional interactions after or in between those messages – potentially in person or over the phone – that are not captured in the text responses. *See, e.g.*, Aplt. App. I at 132–33 (Martinez responding the next day to break up message by texting: "We're on our way now babe I love you so much and can't wait to be there with you [heart emoji] be careful on your way down"). Meaning, the effect of the text messages on Martinez is not recorded solely by his text message responses or, in some instances, perceived lack thereof.

Most significantly, the district court misinterprets the reaction the Government is purporting Suazo's text messages caused. The Government is not intending to offer into evidence Suazo's text messages to explain why Martinez responded the way he did *over text*. Instead, it would like to use the messages to explain why he "acted as [he] did" in allegedly killing Suazo. *Churn*, 800 F.3d at 776. The argument is that these messages reveal Martinez's perception of a fractured relationship, and thus reveal Martinez's motive to kill Suazo.

We stress that these points are simply the Government's arguments based on reasonable inferences drawn from the evidence. Undoubtedly, Martinez can still present counterarguments to the jury, challenging how and whether this evidence supports the Government's theory of his motive, if any. He may also have other valid objections to the admission of this evidence.

Recall that this appeal came to us from an in limine ruling. "Although the Federal Rules of Evidence do not explicitly authorize in limine rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Beyond our determination in this appeal that it was error to rule in limine that the text messages must be excluded from the trial evidence as inadmissible hearsay, our decision does not otherwise undermine the district court's inherent authority to manage the evidence admitted at trial.

## C

Lastly, in the third appeal, the Government argues that the district court erred in excluding witness testimony that, approximately eleven months before Suazo's death, Martinez once pinned her down and strangled her so that she could not leave his home. The Government asserts that this prior act of violence is not offered to prove Martinez's propensity for violence, but it is admissible under Rule 404(b) to show intent, motive, lack of accident, and to rebut

Martinez's claim that he and Suazo had never been in a physical fight. Because prior acts of violence toward the same victim are routinely admitted in similar cases, the Government contends that the district court misapplied both Rule 404(b) and relevant case law in excluding this evidence.

The district court ruled that the witness testimony of a prior instance of domestic violence perpetrated by Martinez against Suazo was inadmissible because the Government failed to meet its burden of demonstrating a permissible use of the domestic abuse evidence that would not involve "a chain of inferences dependent upon the conclusion that [Mr. Martinez] has violent tendencies and acted consistent with those tendencies." Aplt. App. II at 261 (quoting *United States v. Commanche*, 577 F.3d 1261, 1269 (10th Cir. 2009)) (alteration in original). It reasoned "[t]he relevance of the prior bad acts evidence here thus would require the jury first to conclude that Mr. Martinez 'had a propensity for committing violence against [Suazo] and that the alleged murder was such an incident.'" *Id.* (quoting *United States v. Eaves*, 180 F. Supp. 3d 938, 942 (N.D. Okla. 2016)).

We consider the admissibility of evidence under Rule 404(b) to be a "case-specific inquiry" and rely heavily on the district court's "broad discretion." *United States v. Henthorn*, 864 F.3d 1241, 1248 (10th Cir. 2017) (quoting *United States v. Mares*, 441 F.3d 1152, 1157 (10th Cir. 2006)). The timing of the district court's ruling is important because it first ruled Martinez's

statements to Agent Coyle to be inadmissible before it ruled on this motion in limine under Rule 404(b). Because we have now reversed the decision to suppress the post-polygraph statements, we likewise reverse and remand the Rule 404(b) ruling for reconsideration in recognition of the changed evidentiary landscape. The best course of action is to permit the parties to recalibrate their arguments and presentations and give the district court the opportunity to reweigh these arguments in this case-specific inquiry.

## IV

In conclusion, we **REVERSE** the in limine rulings excluding Martinez's post-polygraph statements, the text messages between Suazo and Martinez discussing the end of their relationship, and testimony about an alleged act of domestic violence perpetrated by Martinez against Suazo. We **REMAND** for further proceedings consistent with this opinion.