**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 16, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

KALUB SEAN JACKSON,

    Defendant - Appellant.

No. 24-1341
(D.C. No. 1:23-CR-00321-GPG-JMC-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT\***
_____

Before **ROSSMAN**, **MURPHY**, and **FEDERICO**, Circuit Judges.
_____

On a brisk February morning, police officers assembled near Kalub Jackson's residence to search him and his property pursuant to a search warrant. But as they huddled little more than a mile away from Jackson's home, Jackson himself drove by them on his way to work. The officers scrambled to stop Jackson, and once he was pulled over, engaged him in an interaction that resulted in the officers' obtaining access to his phone, where

---

\* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

the sole source of incriminating evidence was to be found. Jackson appeals the district court's decision to deny suppression of this evidence. But Jackson fails to establish that officers violated the Fourth Amendment when seizing his phone so, exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I

Before addressing the merits, we first set the scene for the investigation that led to Jackson's criminal conviction. We then address the procedural history of this case. We also carefully review the arguments that were made in district court, since they shed greater light on the issues raised on appeal.

## A

Sometime in November 2022 and January 2023, Detective Josh Newman[1] received cyber-tips from the National Center for Missing & Exploited Children about child pornography contained on a Dropbox account. The Dropbox account username identified Jackson as the user, and the account was associated with an email address that contained Jackson's name. The Dropbox account was also associated with an IP address linked

---

[1] Detective Newman is a Colorado police officer who is also a federal task force officer.

to a business in Durango, Colorado. That business, in turn, was linked to a residence in nearby Hesperus, Colorado. Detective Newman confirmed that Jackson lived at this residence through drone surveillance, database checks, and the U.S. Postal Service. With these facts in hand, Detective Newman believed that he had probable cause that Jackson was in violation of 18 U.S.C §§ 2252A(a)(5)(B) and (b)(2), which criminalize possession of child pornography, and that evidence of Jackson's crime would be found on his electronic devices.

Detective Newman applied for a warrant to search Jackson, his home, and his devices. He filed two attachments with his application for a search warrant. The first, Attachment A, was titled "Description of Location to be Searched." R. I at 82. It stated:

> The Subject Premises is located at 614 Robb Road in Hesperus, Colorado, 81326. The Subject Premises is more particularly identified as residential house, red in color with a blue metal roof located on the property at the north end of County Road 122; this residence is one of 3 on this property and is specifically located in the far northeast corner of the property. The location consists of the subject residence, surrounding property, and all outbuildings and vehicles located thereon, and to include the person of Kalub Sean Jackson at the time of the search warrant execution.

R. I at 82. The second attachment, Attachment B, was a "Description of Items to be Seized and Searched" and included, among other things, computers and phones. R. I at 85. On January 31, 2023, a federal magistrate

3

judge approved Detective Newman's application and issued a search warrant that incorporated Attachments A and B by reference.

On February 6, 2023, Detective Newman and a group of officers went to the Robb Road residence to execute the search warrant. They gathered some distance from the residence to prepare for execution. While the officers mingled a little more than a mile away from the Robb Road residence, Jackson himself drove right by them, unhurried on his way to work, and unaware of the ambush he had just almost evaded. The officers' preparations now scuttled, they scrambled to stop him before he could get too far away. They succeeded in pulling Jackson over.

Once stopped, Detective Newman approached Jackson's car.[2] Detective Newman informed Jackson that the officers had a warrant to search his home, his property, and his person. When Jackson asked, "for what," Detective Newman answered, "child pornography." Detective Newman offered to explain more if Jackson was "interested in talking about it," but also informed Jackson he was not under arrest. After Detective Newman briefly explained the events that led his investigation to Jackson,

---

[2] We take these facts about the roadside stop from Detective Newman's bodycam footage, which is part of the record, which the district court relied upon and credited, and which no party takes issue with on appeal.

he asked Jackson about his familiarity with Dropbox accounts. Jackson denied owning a Dropbox account and claimed that he didn't do much online. Detective Newman then informed Jackson that he was "going to be seizing all of [Jackson's] electronics" and asked whether child pornography would be found on any of Jackson's devices. Jackson equivocated. Detective Newman repeated his question by asking: "be honest with me – have you seen some child pornography?" To this, Jackson conceded that he had "seen some in the past."

After some more questioning, Detective Newman asked Jackson where his cell phone was. After Jackson looked down and said, "it's right there,"[3] Detective Newman asked Jackson to "let me go ahead and have your cell phone real fast." Jackson handed it over without protest. When Detective Newman tried to access the contents of the phone, Jackson allowed Detective Newman to hold the phone up to his face so that the phone's facial recognition software could allow entry. Later, Detective Newman asked Jackson what the passcode was for his phone. Jackson not

---

[3] The video of the encounter does not show whether "there" referred to his lap, a cupholder, or somewhere else in the vehicle. The district court did not make a finding of fact regarding the precise location of the cell phone when Jackson handed it over to Detective Newman.

only told Detective Newman what his passcode was, but he also offered to remove the passcode protection entirely to permit ease of access.

Detective Newman then asked Jackson whether he would like to be present at the Robb Road residence while officers searched it, pursuant to the warrant. Jackson said he would like to be present. Before the officers and Jackson circled back to the home, Detective Newman asked if Jackson would consent to an automobile search. Jackson consented. Detective Newman again assured Jackson that he was not under arrest. The officers conducted an automobile search that turned up no further evidence, and thereafter Jackson followed the officers back to the Robb Road residence. Once there, the officers conducted a search but did not seize any items. At the end of the day, only Jackson's phone had been seized. By a subsequent search, officers discovered that Jackson's phone contained evidence of child pornography.

**B**

The Government charged Jackson with one count of child pornography possession, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2). Jackson filed a motion to suppress the evidence obtained from his phone. In the district court, Jackson argued that the officers' conduct exceeded the scope of the warrant they had obtained and therefore violated the Fourth Amendment. The search warrant, Jackson argued, authorized

the officers to search Jackson *only* while Jackson was physically located at the Robb Road residence. This argument revolved entirely around the language in Attachment A of the warrant, which authorized officers to search Jackson "at the time of the search warrant execution." R. I at 82.

The Government responded that the search warrant by its own terms imposed only a temporal restriction on the officers' authority to search Jackson, not a locational restriction. Even if it were otherwise, however, the Government argued that the ambiguity of the warrant language entitled it to the benefit of the good faith exception. And finally, even if the good faith exception did not apply, the Government claimed that the evidence obtained on Jackson's phone would have inevitably been discovered. Importantly, the Government did not concede that inevitable discovery would apply as to the seizure of the phone – on that point, the Government argued that probable cause and several warrant exceptions justified the seizure. The Government assumed that if the officers were held to have exceeded the warrant they had in hand, that same warrant could not authorize the search of the phone. Thus, the inevitable discovery doctrine was needed to tip the Government's case over the edge.

In reply, Jackson argued that the warrant unambiguously barred the officers from searching Jackson anywhere except his home. Under our precedent, Jackson claimed, the good faith exception was not available for

7

an improperly executed warrant. And inevitable discovery did not apply, in Jackson's view, because the Government never sought a second warrant to justify the search of Jackson's phone.

After the parties' briefing, the district court held an evidentiary hearing on the motion to suppress. At the hearing, Detective Newman testified that "a hundred times" out of a hundred, he would have sought a search warrant for the seized phone if he was not otherwise authorized to search it. R. III at 35. After the hearing, the district court handed down its order denying Jackson's motion to suppress.

The district court rejected Jackson's interpretation of the warrant and held that the warrant did not limit the officers' authority to search Jackson only at his home. Even if the warrant did so limit the officers' authority, however, the district court held that the good faith exception would apply. And even if the good faith exception did not apply, the district court held that the officers had sufficient evidence tying Jackson to child pornography that the officers inevitably would have discovered the child pornography evidence on Jackson's phone.

After the district court denied Jackson's motion to suppress, Jackson entered a conditional plea of guilty. He reserved the right to appeal the district court's denial of his motion to suppress. He was then sentenced to

8

36 months of imprisonment, ten years of supervised release, and required to pay $3000 in restitution. This timely appeal followed.

## II

Before reaching the merits of Jackson's appeal, we first set out the relevant standards of appellate review. We ultimately hold that the officers' conduct here was lawful and that Jackson has not established a Fourth Amendment violation in the first instance.

## A

When reviewing motions to suppress, we consider the totality of the circumstances. *United States v. Gay*, 240 F.3d 1222, 1225 (10th Cir. 2001). We review findings of fact for clear error and in the light most favorable to the prevailing party – here, the Government. *United States v. Salas*, 756 F.3d 1196, 1200 (10th Cir. 2014); *cf. United States v. Martinez*, 122 F.4th 389, 404 (10th Cir. 2024). We review conclusions of law and the ultimate determination of Fourth Amendment reasonableness de novo. *United States v. Muhtorov*, 20 F.4th 558, 592 (10th Cir. 2021).

"Where the facts are undisputed, we review de novo the question of whether a search has occurred within the meaning of the Fourth Amendment." *United States v. Nichols*, 144 F.3d 632, 636 (10th Cir. 1998). "The scope of a warrant is a question of law which we review de novo." *United States v. Ortega-Jimenez*, 232 F.3d 1325, 1328 (10th Cir. 2000). "We

also review de novo the applicability of exceptions to the exclusionary rule, such as the good-faith exception" or the inevitable discovery doctrine. *United States v. Gaye*, 130 F.4th 865, 872 (10th Cir. 2025); *see also United States v. Streett*, 83 F.4th 842, 848 (10th Cir. 2023).

Finally, we are free – indeed, duty-bound – to affirm on any basis supported by the record. *Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011). This is so because, whatever the burdens of proof or persuasion in the district court, on appeal the appellant must persuade us to reverse the district court. That principle of appellate review dooms Jackson's appeal because Jackson fails to demonstrate that the officers violated the Fourth Amendment. We therefore find it unnecessary to detain ourselves with competing interpretations of the warrant language or the applicability of exceptions to the exclusionary rule. We instead hold that, regardless of how the warrant is interpreted, the officers did not commit a Fourth Amendment violation that would trigger the exclusionary rule in the first instance.

**B**

In general, evidence obtained in violation of the Fourth Amendment must be suppressed – that is, it cannot be used in a criminal case against the person whose Fourth Amendment rights have been violated. *Davis v. United States*, 564 U.S. 229, 236–37 (2011). The criminal defendant bears

10

the burden of demonstrating that his Fourth Amendment rights were implicated in order to invoke this exclusionary rule. *United States v. Eylicio-Montoya*, 18 F.3d 845, 850 (10th Cir. 1994); *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017). If the defendant makes a prima facie showing that his rights were implicated, the burden then shifts to the Government to establish that its actions were ultimately reasonable or that some exception to the warrant requirement applies. *United States v. Torres*, 987 F.3d 893, 898 (10th Cir. 2021); *United States v. Shrum*, 908 F.3d 1219, 1229 (10th Cir. 2018); *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994). But where the defendant challenges evidence obtained "pursuant" to a warrant, the defendant shoulders the full burden of proof. *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994) ("Generally, 'if the search or seizure was pursuant to a warrant, the defendant has the burden of proof.'" (quoting Wayne LaFave, *Search and Seizure* § 11.2(b) Burden of proof, 6 Search & Seizure § 11.2(b) (6th ed.)).

Jackson fails on appeal to lay the groundwork for application of the exclusionary rule. At least as argued by the parties, the encounter between Jackson and the officers on the side of the road was lawful. The parties all appear to agree – or at least Jackson does not meaningfully contest – that

11

Jackson was lawfully stopped by the side of the road.[4] Even if the warrant itself did not authorize the stop, the officers had at least reasonable suspicion to conclude that Jackson had committed a crime. Detective Newman had reason to believe that the cyberinformation he had gathered was linked to a mobile device. And just as most people keep their phones on their person, child pornography offenders usually keep their contraband on their person.

Under the Supreme Court's post-*Terry* progeny, then, the officers could stop and briefly detain Jackson for questioning.[5] *United States v.*

---

[4] At the point in time that Jackson pulled over and stopped his car at the request of the police, he had been constitutionally seized within the meaning of the Fourth Amendment. *California v. Hodari D.*, 499 U.S. 621, 626–27 (1991).

[5] The Government invokes *Terry* principally as part of its inevitable discovery argument, which we do not reach. Resp. Br. at 25–26. Rather, *Terry* is an independent, lawful basis for this stop.

The dissent argues that our discussion of *Terry* is one never advanced by the Government. Dissent at 7. While it is true that the Government housed its discussion of *Terry* in the inevitable discovery section of its brief, that does not prevent us from the reading the Government's argument on its own terms: "Detective Newman could still stop Jackson based solely on the information from his affidavit justifying the likelihood of contraband being found on Jackson's person." Resp. Br. at 33 (citing case applying *Terry*). The Government did not insensibly *disclaim* that *Terry* authorized Detective Newman's actions here. Instead, *Terry* formed the first plank of the Government's inevitable-discovery argument, which continued on to discuss the automobile exception and consent as possible hypothetical avenues for obtaining the disputed evidence. Resp. Br. at 33–34. Unlike the Government's brief, we stop at *Terry* and go no further, concluding that

*Place*, 462 U.S. 696, 702 (1983) (*Terry* "implicitly acknowledged the authority of the police to make a *forcible* stop of a person when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity"); *United States v. Hensley*, 469 U.S. 221, 229 (1985) ("if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion"); *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011) ("An investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." (internal quotations and citation omitted)).

The dissent concludes that "[t]he circumstances implicating *Terry* are absent here" because "[l]aw enforcement was not acting 'on the spot' when they stopped" Jackson. Dissent at 9. However, that is both contestable as a matter of fact and incorrect as a matter of law.[6] The officers here were

---

Jackson has not shown that a search occurred after *Terry* authorized Detective Newman to briefly stop him.

[6] The dissent's position is not one advanced by Jackson to distinguish the Government's discussion of *Terry*. And again, it was Jackson that bore the burden of persuasion in the district court and now bears it on appeal.

staging their warrant execution when they had to react to evolving and unforeseen circumstances that derailed their plans and risked destruction of the key piece of evidence (which contained contraband). As a matter of fact, that is not dissimilar at all to the *Terry* officer's "on-the-spot" reaction. *Id.* at 9 (quoting *Terry*, 392 U.S. at 20). In any event, we are aware of no case that cabins the application of *Terry* to a nebulous inquiry into whether the surrounding circumstances were sufficiently spontaneous. To the contrary, the Supreme Court and this court have both expanded *Terry*'s application well beyond the facts presented there, as the cases cited above demonstrate.[7] Our reliance on *Terry* is also consistent with other courts that have upheld officer conduct on numerous different grounds. *See, e.g.*, *United States v. Bailey*, 743 F.3d 322, 330–36 (2d Cir. 2014) (concluding on remand

---

[7] The dissent takes the view that we are dodging the central issue in this case. Dissent at 6–7 n.4. But it is not so unusual for cases to be resolved in this way. On the other hand, the dissent's approach to this case should give pause from a birds-eye-view. On the dissent's theory, the fact that the officers here obtained a warrant makes their conduct less, not more, constitutional. But the exclusionary rule incentivizes officers to seek warrants before executing a search. *United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004). Adopting the dissent's view would turn this principle on its head. Had the officers not obtained a warrant at all and engaged in exactly the same conduct, the dissent appears to concede that their conduct would have been constitutional. We fail to see how the Fourth Amendment's purpose would be advanced in applying a rule that punishes the Government for obtaining a warrant, but pivoting from their execution plan when the circumstances so require and the Constitution otherwise permits.

that although the Supreme Court had held that *Summers* did not justify a stop, *Terry* independently did).

*Terry* therefore justified (at minimum) the officers' stopping Jackson by the side of Robb Road and asking him questions about the ongoing investigation. Again, Jackson doesn't contest this point and instead focuses his challenge on the "search" of his person, which led to the seizure of his phone. But Jackson never establishes that the officers' conduct by the side of the road *was* a search. This omission is a fatal gap in Jackson's briefing to this court, and Jackson is charged in this appeal with "advancing the facts and argument entitling [him] to relief." *United States v. Sineneng-Smith*, 590 U.S. 371, 376-77 (2020) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment)).

Jackson's theory of reversal is that the officers improperly executed a search warrant. But neither here nor in the district court did he lay the groundwork for concluding that the roadside stop was a search, or something else occurring pursuant to a search warrant. He bore the burden of establishing that a warrant execution occurred, before inviting us to

opine on its propriety.[8] That step is not perfunctory where, as here, there were multiple plausible lawful pathways available to the Government for obtaining the contested evidence.

At bottom, the threshold question whether his constitutional rights were implicated was a question for Jackson to answer. Particularly where, as here, we must view the facts in favor of the Government, we are left without any basis to apply the exclusionary rule, much less reach the various warrant exceptions that the parties dispute. We therefore hold that the exclusionary rule does not apply here because, as the issues have been framed by the parties, no Fourth Amendment violation occurred. Ultimately, Jackson fails to develop an argument grounded in the record that would allow us to reverse. Failing that, we cannot afford him relief.

AFFIRMED.

Entered for the Court

Richard E.N. Federico
Circuit Judge

---

[8] The district court's order found "that the search warrant was properly executed." R. at 111. We do not read this statement to definitively resolve whether a warrant execution occurred in the first instance.

16

No. 24-1341, *United States* v. *Jackson*
**ROSSMAN**, J., dissenting.

The majority has turned a case about an unlawfully executed warrant into a case about a lawful *Terry* stop, where a warrant is not required.[1] Invoking this alternative ground for affirmance—which not even the government advances—the majority endorses an unconstitutional search and the admission of illegally seized evidence. In my view, reversal is required because the search warrant was improperly executed and no exceptions to the exclusionary rule apply. I would not rely on *Terry* in this context to save the fruits of an unconstitutional search. Doing so undermines the warrant requirement and transfers to law enforcement the unqualified discretion the Fourth Amendment guards against. I respectfully dissent.

**I**

Law enforcement obtained a warrant to search Mr. Jackson's residence. The specific focus of the warrant was a place—the residential property—not a person.[2] But the warrant also authorized searching "the person of

---

[1] *Terry* v. *Ohio*, 392 U.S. 1, 20 (1968).

[2] The attachment to the application for the search warrant was titled "Description of Location to Be Searched" and stated:

> The Subject Premises is located at [address]. The Subject Premises is more particularly identified as residential house, red in color with a blue metal roof located on the property at the north end of County Road 122; this residence is one of 3 on this property and is specifically located in the far northeast corner of the property. The

[Mr.] Jackson at the time of the search warrant execution." RI.82. On the day officers set out to execute the warrant, Mr. Jackson was not home but driving nearby. Law enforcement stopped Mr. Jackson's car about a mile-and-a-half from his residence. When law enforcement stopped him, they invoked the authority of the warrant, telling Mr. Jackson, "We've got a search warrant to search your place today, as well as you and your car and all that stuff—all your electronics and stuff." RI.92 at 00:55–01:01.[3] The search turned up Mr. Jackson's cell phone, which had incriminating evidence that formed the basis for this federal prosecution.

---

location consists of the subject residence, surrounding property, and all outbuildings and vehicles located thereon, and to include the person of Kalub Sean Jackson at the time of the search warrant execution.

RI.82 (heading formatting omitted).

[3] After law enforcement informed Mr. Jackson of the search warrant, they had the following exchange:

Law Enforcement: I'm going to be seizing all of your electronics. . . .
Law Enforcement: Where's your cell phone?
Mr. Jackson: It's right there.
Law Enforcement: It's right there? Okay. Let me go ahead and have your cell phone real fast. . . .
Law Enforcement: So, this is one of the items that I'm gonna take. I have got the search warrant in my car and I'll bring that to you.

RI.92 at 03:10–06:03.

2

Mr. Jackson moved to suppress the evidence seized at the stop, arguing law enforcement had violated the Fourth Amendment by improperly executing a valid search warrant. In response, the government made two arguments. First, the warrant was properly executed, so there was no Fourth Amendment violation. Second, and alternatively, two exceptions to the exclusionary rule applied: the "good faith" exception, *see United States* v. *Leon*, 468 U.S. 897, 920 (1984), and the "inevitable discovery" rule, *see Nix* v. *Williams*, 467 U.S. 431, 444 (1984). The district court denied the motion to suppress. It found no Fourth Amendment violation because "the search warrant was properly executed[.]" RI.108. According to the district court, the "search warrant was not expressly or impliedly limited to a search of [Mr. Jackson]'s person while he was physically located at [the subject premises]." RI.109. In any event, the exceptions urged by the government applied. Mr. Jackson timely appealed.

## II

Reviewing "the evidence in the light most favorable to the determination of the district court[,]" *United States* v. *Johnson*, 43 F.4th 1100, 1107 (10th Cir. 2022) (internal quotation marks omitted), I would find Mr. Jackson's arguments for reversal are availing.

*First*, Mr. Jackson argues law enforcement exceeded the scope of a valid warrant when they stopped his car and searched him some distance from his residence. He is correct. "When interpreting warrants, this court has adopted

3

a standard of practical accuracy rather than technical precision." *United States* v. *Ortega-Jimenez*, 232 F.3d 1325, 1328 (10th Cir. 2000) (internal quotation marks omitted). Given its practical reading, the warrant conditioned the search of Mr. Jackson's person on his presence at the residence when the warrant was executed. Because law enforcement disregarded that condition when they stopped and searched Mr. Jackson, they violated the Fourth Amendment. The remedy, absent an exception, is to exclude the evidence seized from the stop. *See United States* v. *O'Neil*, 62 F.4th 1281, 1290 (10th Cir. 2023) ("Evidence obtained through an unconstitutional search will be inadmissible under the exclusionary rule unless the government proves an exception applies.").

*Second*, Mr. Jackson insists the government has not met its burden of proving an exception applies. I agree. The government first invokes the *Leon* good-faith exception. This exception is implicated only "where 'an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope,' even though the search warrant was later deemed to be invalid." *United States* v. *Herrera*, 444 F.3d 1238, 1249 (10th Cir. 2006) (quoting *Leon*, 468 U.S. at 920). But we have repeatedly "held that the *Leon* good faith exception will not save an *improperly* executed warrant." *United States* v. *Angelos*, 433 F.3d 738, 746 (10th Cir. 2006) (emphasis added) (alteration omitted) (quoting *United States* v. *Rowland*, 145 F.3d 1194, 1208

4

n.10 (10th Cir. 1998)). Here, law enforcement acted outside the scope of the warrant, so good faith is irrelevant.

Next, the government relies on the inevitable discovery rule, which prevents the exclusion of illegally obtained evidence if it "ultimately or inevitably would have been discovered by lawful means[.]" *Nix*, 467 U.S. at 444. The government's reliance on this rule is misplaced. The government said in its answer brief that law enforcement "stop[ped] [Mr. Jackson] to provide him a copy of the warrant[,]" apparently suggesting Mr. Jackson's phone and statements were thus inevitably and lawfully obtained. Ans. Br. at 24. The government sensibly disclaimed this theory at oral argument.

The government also asserts the inevitable discovery doctrine applies because law enforcement "had an independent lawful basis to conduct a *Terry* stop[.]" Ans. Br. at 24. This position is not well taken. Law enforcement told Mr. Jackson he was being stopped *under the warrant*. That is not a *Terry* stop. The government seems to think law enforcement could stop Mr. Jackson based "solely on the information" from the warrant affidavit without actually complying with the conditions set forth in the warrant. Ans. Br. at 26. This misunderstands inevitable discovery. That doctrine allows "unlawfully obtained evidence [to] be admitted at trial if an *independent*, *lawful* police investigation inevitably would have discovered it." *United States* v. *Owens*, 782 F.2d 146, 152 (10th Cir. 1986) (emphasis added). Here, the government

5

provides no basis for the stop that is *independent* of the warrant. Just the opposite: The stop and the improper execution of the warrant are linked, as the government has repeatedly acknowledged. *See* Ans. Br. at 2 (contending Mr. Jackson was stopped and searched "[b]ased on the warrant . . . after he dr[o]ve[] past them staging the search of his residence" (bolding omitted)); Ans. Br. at 7 ("The warrant allowed officers to search [Mr. Jackson] anywhere, so long as the search of his person occurred during the warrant's execution— which it did."); Ans. Br. at 16 (contending "the search warrant authorized a search of [Mr.] Jackson's person," and "stopping him to conduct that search was also part of the warrant's execution"); Ans. Br. at 26 ("[Law enforcement] could still stop [Mr.] Jackson based solely on the information from [the warrant] affidavit[.]").

For these reasons, I readily conclude reversal is required.

### III

The majority seems to assume "the warrant itself did not authorize the stop[.]"[4] Maj. at 12. And the majority does not even "reach the various warrant

---

[4] The government admits law enforcement executed the warrant when they stopped Mr. Jackson down the road from the residence. And the district court so found. The majority acknowledges as much and provides no reasoned basis to conclude otherwise, yet refuses to take a position on the warrant's execution. Maj. at 16 n.8 ("The district court's order found 'that the search warrant was properly executed.' R. at 111. We do not read this statement to definitively resolve whether a warrant execution occurred in the first instance."). Why does the majority hesitate to acknowledge the warrant was executed? Because only

exceptions that the parties dispute." Maj. at 16. The majority instead affirms on an alternative ground, concluding "*Terry* is an independent, lawful basis for this stop." Maj. at 13 n.5. I disagree.

At the outset, it is worth mentioning this theory of affirmance is wholly of the majority's making. The government never advanced it. The government did not argue *Terry* was an independent basis for the stop but distinctly wedged *Terry* under the inevitable discovery doctrine. Still, the majority reasons, "we are free – indeed, duty-bound – to affirm on any basis supported by the record." Maj. at 10 (citing *Richison* v. *Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011)). I certainly agree, generally, that appellate courts have such discretion when certain conditions are satisfied. *See Elkins* v. *Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004) (recognizing we have "discretion to affirm on any ground adequately supported by the record" and identifying factors to consider before exercising that discretion). But the majority's reliance on *Terry* seems less an alternative ground supported by the record and more an alternative argument crafted for the government. *See United States* v. *Yelloweagle*, 643 F.3d 1275, 1284 (10th Cir. 2011) (observing "[w]e cannot make arguments for [a party]").

On the merits, there are problems with relying on *Terry* to affirm.

---

if the warrant was *not* executed—that is, if this case was not about a warrant at all—would it make any sense to rely on *Terry* here.

7

The Fourth Amendment protects the public from "unreasonable searches and seizures[.]" U.S. CONST. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is reasonableness[.]" *Brigham City* v. *Stuart*, 547 U.S. 398, 403 (2006) (internal quotation marks omitted). The Fourth Amendment's mandate of "reasonableness generally requires the obtaining of a judicial warrant." *Riley* v. *California*, 573 U.S. 373, 382 (2014) (quoting *Vernonia Sch. Dist. 47J* v. *Acton*, 515 U.S. 646, 653 (1995)); *see also United States* v. *Cantu*, 405 F.3d 1173, 1178 (10th Cir. 2005) ("By its terms, the Fourth Amendment intimates a strong preference for warrants."). *Terry* is an exception to that general rule, allowing officers to conduct investigative stops without a warrant or probable cause. *See Dunaway* v. *New York*, 442 U.S. 200, 210 (1979) (explaining "*Terry* involved an exception to the general rule requiring probable cause"). *Terry* has little to do with police conduct involving warrants. It concerns a different kind of "police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." *Terry*, 392 U.S. at 20. *Terry* permits a stop "for the purpose of questioning limited to the purpose of the stop," *Florida* v. *Royer*, 460 U.S. 491, 498 (1983) (plurality opinion), and a frisk "to allow the officer to pursue his investigation without fear of violence," *Adams* v. *Williams*, 407 U.S. 143, 146 (1972).

8

The circumstances implicating *Terry* are absent here. Law enforcement was not acting "on the spot" when they stopped Mr. Jackson. They were operating pursuant to a warrant, issued by a judicial officer who carefully prescribed conditions (unmet here) to search Mr. Jackson. I am aware of no case—and neither the government nor the majority cites one—where *Terry* can be invoked as an excuse for flouting the terms of a warrant.[5]

Relying on *Terry* here undermines the warrant requirement. The warrant requirement is "an important working part of our machinery of government, not merely an inconvenience to be somehow weighed against the claims of police efficiency." *Riley*, 573 U.S. at 401 (internal quotation marks omitted). A warrant ensures that the inferences to support a search are "drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson* v. *United States*, 333 U.S. 10, 14 (1948). By invoking an exception that applies to warrantless searches, the majority sidesteps the very protections the warrant requirement safeguards and avoids dealing with the warrant-specific constitutional violation that forms the basis for Mr. Jackson's appeal. *See*

---

[5] Of course, *Terry* cannot be deployed as a kind of proxy for the good-faith exception, which all agree has no application here. *See Angelos*, 433 F.3d at 746 (holding "that the *Leon* good faith exception will not save an *improperly* executed warrant" (emphasis added) (alteration omitted) (internal quotation marks omitted)).

*United States* v. *Muhtorov*, 20 F.4th 558, 605 (10th Cir. 2021) (recognizing "individualized judicial review, a finding of probable cause, and particularity" are the "safeguards . . . embodied in the warrant requirement"). To be sure, the "needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards." *Almeida-Sanchez* v. *United States*, 413 U.S. 266, 273 (1973).

In light of these principles, and since the record compels reversal on the arguments presented, I respectfully cannot join today's decision.